Jeffrey Lewis (66587)
Jacob Richards (273476)
KELLER ROHRBACK L.L.P.
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
(510) 463-3900, Fax (510) 463-3901
jrichards@kellerrohrback.com
jlewis@kellerrohrback.com

Matthew Preusch (298144)
KELLER ROHRBACK L.L.P.
1129 State Street, Suite 8
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497
mpreusch@kellerrohrback.com

***Attorneys for Plaintiffs***
***(Additional Counsel Listed on Signature Page)***

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| KIMBERLY CORCORAN, and TODD BEAULIEU, individually and on behalf of all other similarly situated,<br><br>                Plaintiffs,<br><br>    v.<br><br>MYLAN PHARMACEUTICALS INC., and MYLAN SPECIALTY L.P.,<br><br>                Defendants. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>Judge: |

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     PARTIES ..........................................................................................................3

III.    JURISDICTION AND VENUE ........................................................................3

IV.     INTRADISTRICT ASSIGNMENT ..................................................................4

V.      FACTUAL ALLEGATIONS ............................................................................4

        A.      Epinephrine Auto-Injectors Are Life-Saving Medical Devices.............4

        B.      In 2007, Mylan Acquired the Exclusive Right to Distribute the EpiPen®.......................5

        C.      Mylan Used Unfair Marketing and Lobbying to Gain a Dominant Position
                in the Auto-Injector Market .....................................................................6

        D.      Mylan Used its Dominant Position to Raise Prices of the EpiPen® to over
                $600..........................................................................................................7

        E.      Mylan's Prices Prevent Consumers From Purchasing Life-Saving
                Medication ...............................................................................................8

        F.      Mylan Begins to Sell EpiPen®s Only in "2-Paks", Further Increasing the
                Cost to Consumers ................................................................................10

        G.      In 2016, Federal and State Governments Begin to Investigate Mylan's
                Deceptive Business Practices.................................................................12

                1.      The United States Department of Justice Begins Fraud
                        Investigations ............................................................................12

                2.      Senators Ask the Federal Trade Commission To Investigate Mylan ...................14

                3.      The New York State Attorney General Begins Antitrust
                        Investigations ............................................................................15

                4.      The West Virginia State Attorney General Initiates Fraud
                        Investigations ............................................................................15

        H.      In September 2016, Congress Convened a Hearing Regarding Mylan's
                Price Hikes in Response to Consumer Complaints.................................16

        I.      Mylan, Seeking to Justify its Price Increases, Made a Number of Material
                Misrepresentations to the Congressional Committee ............................17

                1.      Mylan Misrepresented its Costs & Profits ................................17

                2.      Mylan Misrepresented its "Re-Design" of the EpiPen® ......................18

CLASS ACTION COMPLAINT

J.       Plaintiffs' Purchases ................................................................................20

VI.    CLASS ALLEGATIONS ......................................................................................21

VII.   CLAIMS FOR RELIEF ......................................................................................22

FIRST CLAIM FOR RELIEF VIOLATION OF CALIFORNIA CONSUMERS
    LEGAL REMEDIES ACT On Behalf of Plaintiff Corcoran and the
    California Members of the Class Against All Defendants  (Cal. Civ. Code
    §§ 1750, *et seq.*) ..........................................................................................22

SECOND CLAIM FOR RELIEF VIOLATION OF CALIFORNIA'S FALSE
    ADVERTISING LAW On Behalf of Plaintiff Corcoran and the California
    Members of the Class Against All Defendants (Cal. Bus. & Prof. Code §§
    17500, *et seq.*) ............................................................................................24

THIRD CLAIM FOR RELIEF VIOLATION OF THE CALIFORNIA UNFAIR
    COMPETITION LAW On Behalf of Plaintiff Corcoran and the California
    Members of the Class Against All Defendants  (Cal. Bus. & Prof. Code §§
    17200, *et seq.*) ............................................................................................25

FOURTH CLAIM FOR RELIEF VIOLATIONS OF THE MASSACHUSETTS
    CONSUMER PROTECTION ACT On Behalf of Plaintiff Beaulieu and
    the Massachusetts Members of the Class Against All Defendants (Mass.
    Gen. Laws Ch. 93A §§ 1, *et seq.*) ...............................................................27

FIFTH CLAIM FOR RELIEF FRAUD BY CONCEALMENT ................................28

SIXTH CLAIM FOR RELIEF NEGLIGENT MISREPRESENTATION ...................29

SEVENTH CLAIM FOR RELIEF UNJUST ENRICHMENT ...................................30

EIGHTH CLAIM FOR RELIEF DECLARATORY JUDGMENT ............................30

VIII.  REQUEST FOR RELIEF ...................................................................................31

IX.    JURY TRIAL DEMANDED ...............................................................................31

CLASS ACTION COMPLAINT

Plaintiffs Kimberly Corcoran and Todd Beaulieu individually and on behalf of all others similarly situated, file this Class Action Complaint against Mylan Pharmaceuticals, Inc., and Mylan Specialty L.P. ("Defendants" or "Mylan"), and allege as follows based on personal knowledge, the investigation of their counsel, and information and belief.

## I.     INTRODUCTION

1.      At the heart of this proposed class action is a pharmaceutical corporation seeking to boost profits at the expense of families who need the lifesaving product it sells.  The product at issue is the EpiPen®, a lifesaving emergency auto-injector treatment for millions of people who suffer from severe allergies and are at risk for anaphylaxis.  Anaphylaxis is a potentially life-threatening allergic reaction that can occur quickly, sometimes within minutes, following exposure to an allergen including foods, medicines, latex, and insect bites or stings.  EpiPen®s are sold in packs of two, expire, and must be replaced on an annual basis.

2.      The need for many families to have one or more EpiPen®s on hand is hard to overstate. According to Food Allergy Research & Education—an allergy advocacy and research group— approximately 15 million people have food allergies in the United States and allergic reactions account for about 200,000 emergency room visits per year.

3.      When someone has a severe allergic reaction, he or she must promptly inject themselves or be injected with epinephrine to prevent anaphylactic shock.  Anaphylactic shock can kill, so having handy, pre-measured, pre-loaded epinephrine in a portable EpiPen® can be lifesaving.

4.      Mylan is the only company selling EpiPen®s, and it has increased the price of its product more than 500% since 2007 when it began selling the device, which originally cost just $94.00 for a two-pack.  While the EpiPen® reportedly costs Mylan just $34.50[1] to produce, today it sells the EpiPen® for a staggering amount: $600 or more for a two-pack.

---

[1] This figure is according to testimony provided by Mylan's CEO.  *See* Ben Popken, *Lawmakers Accuse Mylan CEO of 'Rope-a-Doping' on EpiPen Prices*, NBC News (Sept. 21, 2016),

5.      Plaintiffs Kimberly Corcoran and Todd Beaulieu must buy EpiPen®s to protect themselves and/or their children from anaphylactic shock and, because they expire, must be purchased every year.

6.      Plaintiffs bring this consumer class action individually and on behalf of a putative nationwide class, as defined below (hereinafter "the Class").  Plaintiffs seek declaratory and injunctive relief, and to recover drug payments and overpayments made from at least the year 2007 through the present (hereinafter the "relevant time period"), as a result of Defendants' unlawful scheme involving unfair, exorbitant, and unconscionable price increases.

7.      This case concerns all EpiPen® products manufactured and distributed by Defendants including the following:

A.      EpiPen®;

B.      EpiPen Jr.®;

C.      EpiPen 2-Pak®;

D.      EpiPen Jr. 2-Pak®;

E.      My EpiPen®;

F.      LIFE HAPPENS®;

G.      Be Pepared®;

H.      EpiPen4Schools®;

I.      Never-See-Needle®.

---

http://www.nbcnews.com/business/consumer/lawmakers-grill-mylan-ceo-fda-epipen-price-hike-n65120.  But, other estimates are even lower.  *See* Martha C. White, *Its Jaw-Dropping How Little it Costs to Make an Epipen*, Time (Sept. 7, 2016), http://time.com/money/4481786/how-much-epipen-costs-to-make/ ("Pharmaceutical industry experts estimate that the medicine and its auto-injector, for which Mylan charges roughly $300 a pop, cost around $30 to produce.  According to one medical technology consultant cited by NBC News, Mylan might pay even less, maybe as little as $20, for each EpiPen, which cost patients a retail price of more than $600 for a two-pack.").

CLASS ACTION COMPLAINT

## II.     PARTIES

8.     Plaintiff Kimberly Corcoran is a citizen and resident of the State of California.

9.     Plaintiff Todd Beaulieu is a citizen and resident of the State of Massachusetts.

10.     Plaintiffs have each purchased multiple EpiPen® products manufactured and distributed by Defendants Mylan Pharmaceuticals Inc. and Mylan Specialty L.P.

11.     The retail price of EpiPen®s is approximately $600.  Some insurance plans cover EpiPen®s and some do not, but even when insurance covers the EpiPen®, patients are often required to pay a substantial portion of the $600 price tag.

12.     Defendants are subsidiaries and/or divisions of Mylan N.V. a global generic and specialty pharmaceutical company, and the second-largest generic and specialty pharmaceutical company in the world.

13.     Mylan Pharmaceuticals Inc. is headquartered in Canonsburg, Pennsylvania and conducts extensive business nationwide, including in the State of California.

14.     Mylan Specialty L.P. is headquartered in Basking Ridge, New Jersey and has operations in Napa, California and Allen, Texas.  Mylan Specialty also conducts extensive business in the State of California.

## III.     JURISDICTION AND VENUE

15.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because Plaintiff Corcoran resides in California, and Defendants maintain headquarters in Pennsylvania and/or New Jersey.  This Court also has original jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) ("CAFA"), as to the named Plaintiffs and every Class Member, because the proposed Class contains more than 100 members, the aggregate amount in controversy exceeds $5 million, and Class Members reside across the United States and are therefore diverse from Defendants.

16.     This Court has personal jurisdiction over Defendants because Defendants have significant minimum contacts with this State, and intentionally availed themselves of the laws of California by transacting a substantial amount of business throughout the State and this District.

17.     Venue is proper under 18 U.S.C. § 1965(a), because Defendants are subject to personal jurisdiction in this District as alleged above, and Defendants have agents located in this District.

## IV.     INTRADISTRICT ASSIGNMENT

18.     Assignment to the Northern District of California, San Francisco Division, is appropriate because Plaintiff Kimberly Corcoran resides in this Division and District, and Defendants transact a substantial amount of business throughout this District.

## V.     FACTUAL ALLEGATIONS

### A.     Epinephrine Auto-Injectors Are Life-Saving Medical Devices

19.     An epinephrine auto-injector—pictured below—is a hand-held device used by those with severe allergies as an emergency treatment for anaphylactic shock, a serious and rapid onset allergic reaction.[2]



https://en.wikipedia.org/wiki/Epinephrine_autoinjector

20.     As the below diagram indicates, the device functions by using a spring-loaded needle to inject an adrenaline solution (epinephrine) which can prevent anaphylactic shock when the device is pressed against the skin.[3]

---

[2] Steve Brachman, *EpiPen Gives Doses of Life-Saving Epinephrine for Nearly 50 Years,* IPWatchDog (Jun. 28, 2016), http://www.ipwatchdog.com/2016/06/28/evo-of-tech-sheldon-kaplans-epipen-gives-doses-of-life-saving-epinephrine-for-nearly-50-years/id=70024/.

[3] Ben Popken, *Mylan's Upgraded EpiPen Torn Apart By Experts*, NBC News (Sept. 20, 2016), http://www.nbcnews.com/business/consumer/mylan-says-it-upgraded-epipen-2009-so-experts-looked-inside-n652651.



Rev 1 EpiPen® Complete Device



Rev 1 EpiPen® Part Breakdown

1. Housing
2. Sleeve
3. Cartridge and Stopper
4. Stopper Driver
5. Plunger (formed of two laser cut brass sheet parts)
6. Drive Spring
7. Release Collar
8. Thrust washer
9. Rear Collar
10. Safety Cap

http://www.nbcnews.com/business/consumer/mylan-says-it-upgraded-epipen-2009-so-experts-looked-inside-n652651

21.     Anaphylactic shock can manifest in a variety of symptoms, from "vomiting to severe swelling, but by far the most dangerous is difficulty breathing, in which case emergency epinephrine is essential."[4]

22.     The onset of anaphylactic shock is unpredictable and "can be triggered by many allergens, including food, medicine, bee stings, and in lesser cases, foreign substances like latex."[5]

23.     Around 200,000 Americans experience anaphylactic shock annually.  Nearly 200 of them die as a result.[6]

**B.      In 2007, Mylan Acquired the Exclusive Right to Distribute the EpiPen®**

24.     The auto-injector device was first developed for the United States military.  In 1973, in response to the threat of chemical weapons, the Pentagon requested that Survival Technology, Inc. develop an auto-injector to administer a nerve agent antidote, which was originally called the

---

[4] Matt Reimann, Timeline, *The Story of the EpiPen: From Military Technology to Drug-Industry Cash Cow*, (Aug. 20, 2016), https://timeline.com/epipen-technology-drug-industry-b28d19036dee#.seg6n7dls.
[5] *Id.*
[6] *Id.*

ComboPen, and was later modified to deliver epinephrine, thus creating the EpiPen®.[7]

25.     The device was developed relatively inexpensively because the epinephrine drug itself cost only about a dollar to produce.[8]

26.     Today, however, a set of two EpiPen® auto-injectors costs more than $600.

27.     In 1996, Survival Technology, Inc. merged with Meridian Medical Technologies[9] which, only one year later, sold the exclusive right to market and distribute Survival Technologies' EpiPen® to Dey LP, a subsidiary of a German multinational pharmaceutical company: Merck KGaA.[10]

28.     Mylan acquired the right to market and distribute the EpiPen® line of epinephrine auto-injector devices from Merck as part of broader 2007 acquisition deal.[11]

29.     At the time that Mylan acquired the right to distribute the EpiPen®, the device only produced around $200 million in revenue,[12] but, on information and belief, Mylan saw the acquisition as an opportunity to increase profits through marketing, price increases, and lobbying.

**C.     Mylan Used Unfair Marketing and Lobbying to Gain a Dominant Position in the Auto-Injector Market**

30.     Heather Bresch, Mylan's chief executive officer, sought, through advertising and lobbying, to make the brand "EpiPen® as identified with Auto-Injectors as Kleenex® is with facial tissue."[13]

---

[7] Matt Reimann, *The Story of the EpiPen: From Military Technology to Drug-Industry Cash Cow*, Timeline, (Aug. 20, 2016), https://timeline.com/epipen-technology-drug-industry-b28d19036dee#.seg6n7dls.
[8] *Id.*
[9] Meridian Medical Technologies 10-K Filing (Jul. 31, 1997).
[10] Marilyn Case, *EpiPen Recall Points to Broader Concerns*, Wall Street Journal (May, 10, 1998).
[11] Tara Parker-Pope & Rachel Rabkin Peachman, *EpiPen Price Rise Sparks Concern for Allergy Sufferers*, N.Y. Times (Aug. 22, 2016).
[12] Cynthia Koons & Robert Langreth, *How Marketing Turned the EpiPen Into a Billion-Dollar Business*, Bloomberg Businessweek (Sept. 23, 2015), http://www.bloomberg.com/news/articles/2015-09-23/how-marketing-turned-the-epipen-into-a-billion-dollar-business.
[13] *Id.*

31.     Mylan began by lobbying the Food and Drug Administration to expand its consumer market.  Prior to 2007, physicians  prescribed the device only to severe allergy sufferers who had an incident of anaphylactic shock in the past.  But Mylan successfully lobbied the Food and Drug Administration to expand the permitted uses of the EpiPen®, allowing the device to be prescribed to any patient that had any risk of anaphylaxis.[14]

32.     Mylan went on to successfully lobby for the passage of legislation requiring that epinephrine be made available in schools and in public places, like defibrillators;[15] and, according to a statement by Bresch at the Morgan Stanley Healthcare Brokers conference on September 17, 2016, Mylan is now pursuing: "new markets with public entity legislation that would allow restaurants and hotels and really anywhere you are congregating . . . to [store] an EpiPen®."[16]

33.     Mylan also spent over $35 million in one year on "aggressive marketing tactics that . . . led to the overall perception that the Mylan EpiPen® is an essential first aid device that no one should be without"[17] including television advertisements warning that: "Every six minutes, food allergies send someone to the hospital.  Always avoid your allergens, and talk to your doctor about a prescription treatment you should carry for reactions."[18]

**D.     Mylan Used its Dominant Position to Raise Prices of the EpiPen® to over $600**

34.     As a result of Mylan's extensive marketing, lobbying and branding efforts, between 2007 and 2015 Mylan gained a commanding 85% share of the auto-injector market and, taking

---

[14] *Id.*

[15] *Id.*

[16] Mylan NV transcript from presentation at Morgan Stanley Healthcare Brokers Conference, (Sept. 17, 2015), http://seekingalpha.com/article/3518926-mylan-nv-presents-morgan-stanley-healthcare-brokers-conference-transcript.

[17] Lucy Bayly & Emma Margolin, *How Mylan's Multimillion-Dollar Marketing Convinced Us We Need the EpiPen*, NBC News (Aug. 25, 2016), http://www.nbcnews.com/business/business-news/how-mylan-s-multimillion-dollar-marketing-convinced-us-we-need-n637781.

[18] *Id.*

advantage of its dominant market position, began to raise prices.[19]

35.     In 2007, the price of two EpiPen®s was approximately $100.  The price was about the same in 2009, but by July 2013 Mylan raised the price to $265.  In May 2015 it raised it again to $461. Most recently, in May 2016, Mylan raised the price to $609.[20]

36.     As the below chart, reproduced from a *Bloomberg* report on the company, indicates, this increase in price was precipitous, and boosted annual sales accordingly.[21]



http://www.bloomberg.com/news/articles/2015-09-23/how-marketing-turned-the-epipen-into-a-billion-dollar-business

**E.     Mylan's Prices Prevent Consumers From Purchasing Life-Saving Medication**

37.     In 2015, as a result of Mylan's above-described practices, sales of the EpiPen® reached around $1.5 billion and accounted for 40% of Mylan's profits.[22]

---

[19] Emily Willingham, *Why Did Mylan Hike EpiPen Prices 400%? Because They Could*, Forbes (Aug. 21, 2016).

[20] Tara Parker-Pope & Rachel Rabkin Peachman, *EpiPen Price Rise Sparks Concern for Allergy Sufferers*, New York Times (Aug. 22, 2016).

[21] Cyntha Koons & Robert Langreth, *How Marketing Turned the EpiPen Into a Billion Dollar Business*, Bloomberg Businessweek (Sept. 23, 2015), http://www.bloomberg.com/news/articles/2015-09-23/how-marketing-turned-the-epipen-into-a-billion-dollar-business.

[22] Emily Willingham, *Why Did Mylan Hike EpiPen Prices 400%? Because They Could*, Forbes (Aug. 22, 2016), http://www.forbes.com/sites/emilywillingham/2016/08/21/why-did-mylan-hike-epipen-prices-400-because-they-could/#32036983477a.

CLASS ACTION COMPLAINT

38.     But Mylan's profits came at the expense of allergy sufferers.  According to one analysis published in *Forbes* magazine: "Even after insurance pays, the customer can be out $400 or more for a pack of two pens, a dollar value that can vary depending on how high the deductible is.  And most customers need EpiPen®s for home and at school for their child . . ."[23]  Moreover, because EpiPen® products have one of the shortest expiration periods of any drug product on the market, these costs must be incurred annually.[24]

39.     As a result of this drastic price increase, according to several reports, many patients have been unable to afford their EpiPen®s and have simply stopped buying them, despite their continued need to have a prescription treatment available in an emergency.[25]

40.      Some doctors and engineers have developed home-made alternatives to the EpiPen® which reportedly cost less than $50 to make.[26]

41.     Even cities and towns have resorted to creating their own work-arounds.  For example, in King County, Washington, the Emergency Medical Services staff has put together affordable kits to use for emergency purposes dubbed "Epi Kits" instead of purchasing EpiPen®s which many agencies no longer have the budget for.[27]

42.     But, non-experts are forced to either go without life-saving medication or inject the epinephrine themselves using a syringe that "carries the risk of injection into a vein, instead of muscle,

---

[23] *Id.*

[24] Alice Park, *Expired EpiPens: What You Need to Know*, Time (Aug. 30, 2016), http://time.com/4471773/expired-epipens-what-you-need-to-know/.

[25] Emily Willingham, *Why Did Mylan Hike EpiPen Prices 400%? Because They Could*, Forbes (Aug. 22, 2016), http://www.forbes.com/sites/emilywillingham/2016/08/21/why-did-mylan-hike-epipen-prices-400-because-they-could/#32036983477a.

[26] Fortune, *A Minnesota Doctor is Trying to get a $50 EpiPen Alternative to the Market* (Sept. 15, 2016), http://fortune.com/2016/09/15/epipen-alernative-cheap/.

[27] The Seattle Times, *King County Drops EpiPen for Cheaper Kit With Same Drug*, (Jan. 15, 2015), http://www.seattletimes.com/seattle-news/king-county-drops-epipen-for-cheaper-kit-with-same-drug/.

which can be fatal."[28]

**F.    Mylan Begins to Sell EpiPen®s Only in "2-Paks", Further Increasing the Cost to Consumers**

43.    In 2010, the National Institute of Allergy and Infectious Diseases ("NAID") issued a report indicating that doctors should be permitted to prescribe two doses of epinephrine in order to cover a minority of patients (around 20%), who may not respond effectively to only one dose.[29]

44.    At the time, Mylan CEO Bresch referred to the NAID report, among others, as a "big event that we've started to capitalize on"[30] and sought to "encourage physicians"[31] to follow the report regarding dosage.  Mylan also stopped selling single EpiPen®s, instead providing only "2-Pak" products, pictured below.



http://www.savelives.com/product/epipen-2-pack-8530.cfm

---

[28] Emily Willingham, *Why Did Mylan Hike EpiPen Prices 400%? Because They Could*, Forbes (Aug. 22, 2016), http://www.forbes.com/sites/emilywillingham/2016/08/21/why-did-mylan-hike-epipen-prices-400-because-they-could/#32036983477a.

[29] Medical News Net, *Mylan Subsidiary to exclusively offer EpiPen and EpiPen Jr 2-Pak Auto-Injector*, (Aug. 24, 2011), http://www.news-medical.net/news/20110824/Mylan-subsidiary-to-exclusively-offer-EpiPen-2-Pak-and-EpiPen-Jr-2-Pak-Auto-Injector.aspx.

[30] Cyntha Koons & Robert Langreth, *How Marketing Turned the EpiPen Into a Billion Dollar Business*, Bloomberg Businessweek (Sept. 23, 2015), http://www.bloomberg.com/news/articles/2015-09-23/how-marketing-turned-the-epipen-into-a-billion-dollar-business.

[31] Medical News Net, *Mylan Subsidiary to exclusively offer EpiPen and EpiPen Jr 2-Pak Auto-Injector* (Aug. 24, 2011), http://www.news-medical.net/news/20110824/Mylan-subsidiary-to-exclusively-offer-EpiPen-2-Pak-and-EpiPen-Jr-2-Pak-Auto-Injector.aspx.

45.    As a result of Mylan's decision, existing EpiPen® users who purchased single pens only, were forced to pay more for the two pack product, regardless of whether two pens were needed or not.

46.    Despite the fact that "there is no safety issue with the EpiPen® and EpiPen Jr.®  [being sold in a] single package[,]"[32] Bresch, in one statement, described the move as critical to patient safety for all patients, not only a small minority who do not respond to a single dose.  She explained:

> Many people may not be aware that recent food allergy guidelines state that patients at risk for, or who have experienced anaphylaxis should have immediate access to two doses of epinephrine. The decision to exclusively offer the EpiPen 2-Pak®, which contains two single EpiPen® Auto-Injectors, aligns with these guidelines, as well as with the 2011 World Allergy Organization (WAO) anaphylaxis guidelines which recommend that physicians consider prescribing more than one epinephrine auto-injector. Mylan and Dey are committed to increasing the overall awareness of being prepared for a potentially life-threatening allergic reaction.[33]

47.    Indeed, even before the National Institute of Allergy and Infectious Diseases issued its report, "[o]ne element of Mylan's outreach efforts [wa]s to advise patients to double up on EpiPen®s . . . [out of] fear that 'something could go wrong with your first attempt at giving the shot.'"[34]  But, according to a study conducted by the American Academy of Allergy, Asthma & Immunology only a "small number of patients . . .  require a second dose" and "the device is mainly sold in packs of two due to imperfect product design" causing "14 percent of parents [to] . . . accidentally stick the needle in their own thumb instead of in their child's leg, as compared to zero percent of parents using" a competitor's product.[35]

---

[32] *Id.*
[33] *Id.*
[34] Lucy Bayly & Emma Margolin, *How Mylan's Multimillion-Dollar Marketing Convinced Us We Need the EpiPen*, NBC News (Aug. 25, 2016), http://www.nbcnews.com/business/business-news/how-mylan-s-multimillion-dollar-marketing-convinced-us-we-need-n637781.
[35] Lucy Bayly & Emma Margolin, *How Mylan's Multimillion-Dollar Marketing Convinced Us We Need the EpiPen*, NBC News (Aug. 25, 2016), http://www.nbcnews.com/business/business-news/how-mylan-s-multimillion-dollar-marketing-convinced-us-we-need-n637781.

11                                    CLASS ACTION COMPLAINT

**G.    In 2016, Federal and State Governments Begin to Investigate Mylan's Deceptive Business Practices**

48.    In 2016, following widespread criticism of Mylan's unrelenting, self-promoting sales practices, many aspects of Mylan's business were called into question by federal and state regulators.

**1.    The United States Department of Justice Begins Fraud Investigations**

49.    In September 2016, the United States Department of Justice investigated Mylan's Medicaid Drug rebate program following allegations that the company had improperly classified the EpiPen® as a generic drug, "which provides a rebate of 13 percent to state Medicaid programs, rather than as a [name-brand] drug, which pays a minimum rebate of 23.1 percent."[36]

50.    The difference between the 13 and 23.1 percent rebate is made up by the taxpayer who was handed a hefty bill: "Medicaid spent about $66.4 million on EpiPen®s in 2011.  That amount was up to $365 million last year.  Medicare's prescription drug program, Medicare Part D, spent $20 million on the auto-injectors in 2011 and a whopping $121.7 million in 2015."[37]

51.    The Centers for Medicare and Medicaid Services, "on multiple occasions, provided guidance to the industry and Mylan on the proper classification of drugs and has expressly advised Mylan that their classification of EpiPen® for purposes of the Medicaid Drug Rebate program was incorrect."[38]

52.    Besides paying Medicaid a too-low rebate on EpiPen® purchases, the Centers for Medicare and Medicaid Services alleged that Mylan failed to pay Medicaid a second rebate that is required when a brand-name drug price rises more than inflation; and "[t]he price of an EpiPen® pack

---

[36] Diane Bartz, *U.S. Agency Told Mylan that EpiPen was Misclassified*, Reuters (Sept. 28, 2016), http://www.reuters.com/article/us-congress-mylan-nl-idUSKCN11Y1X5.

[37] Emily Willingham, *EpiPen Make Mylan Agrees to $465 Million Settlement With DOJ*, Forbes (Oct. 7, 2016), http://www.forbes.com/sites/emilywillingham/2016/10/07/epipen-maker-mylan-agrees-to-465-million-settlement-with-doj/#15439733c921.

[38] Diane Bartz, *U.S. Agency Told Mylan that EpiPen was Misclassified*, Reuters (Sept. 28, 2016), http://www.reuters.com/article/us-congress-mylan-nl-idUSKCN11Y1X5.

CLASS ACTION COMPLAINT

rose 23 percent a year on average between 2007 and 2016 [while] [i]nflation has averaged less than 2 percent a year over the same period."[39]

53.   Mylan has said it "falls under an exemption that allows it to pay the 13 . . . percent rebate, since the medication inside EpiPen® is off-patent [even though] the device itself is patent-protected."[40]

54.   However, on October 7, 2016, Mylan announced a $465 million settlement[41] with the United States Department of Justice to "resolve questions that have been raised about the classification of [the] EpiPen® Auto-Injector and EpiPen Jr® Auto-Injector (collectively, "EpiPen Auto-Injector") for purposes of the Medicaid Drug Rebate Program."[42]

55.   The settlement terms provide for resolution of all potential rebate liability claims by federal and state governments as to whether the product should have been classified as a name brand drug for the Centers for Medicare and Medicaid Services' purposes and subject to a higher rebate formula.  In connection with the settlement, Mylan expects to enter into a corporate integrity agreement with the Office of Inspector General of the Department of Health and Human Services.

56.   The settlement has not been finalized, however, and has drawn criticism from some government officials.  According to Senator Richard Blumenthal, the settlement is "a shadow of what it should be.  The deal short-circuits investigation and fact-finding necessary to determine the scope of

---

[39] Linda A. Johnson, *Mylan to Pay $465M Settlement over Medicaid EpiPen Rebates*, Jems (Oct. 10, 2016), http://www.jems.com/articles/news/2016/10/mylan-to-pay-465m-settlement-over-medicaid-epipen-rebates.html.

[40] Mylan, *Mylan Agrees to Settlement on Medicate Rebate Classifications for EpiPen Auto-Injector*, (Nov. 9, 2016), http://newsroom.mylan.com/2016-10-07-Mylan-Agrees-to-Settlement-on-Medicaid-Rebate-Classification-for-EpiPen-Auto-Injector.

[41] Mylan, *Mylan Agrees to Settlement on Medicate Rebate Classifications for EpiPen Auto-Injector*, (Nov. 9, 2016), http://newsroom.mylan.com/2016-10-07-Mylan-Agrees-to-Settlement-on-Medicaid-Rebate-Classification-for-EpiPen-Auto-Injector, (Mylan will include a pre-tax charge of approximately $465 million in the quarter ended Sept. 30, 2016 as a result of this settlement).

[42] Antoine Gara, *Mylan Surges After Quickly Settling with DOJ Over EpiPen Medicaid Rebates*, Forbes (Oct. 8, 2016), http://www.forbes.com/sites/antoinegara/2016/10/08/mylan-surges-after-quickly-settling-with-doj-over-epipen-medicaid-rebates/#2d0dd25c6afb.

CLASS ACTION COMPLAINT

illegality, culpability of individuals and proof of criminal wrongdoing."[43]

57.    Senator Blumenthal went on to explain: "This settlement is blatantly inadequate, not only in dollar amount, but also Mylan's avoiding admission of moral and legal responsibility."[44]

58.    Senator Charles Grassley also voiced his concerns, explaining that: "It's unclear whether this settlement is fair or in proportion to the amount Mylan overcharged the taxpayers.  It's also unclear how much money is going back to the states."[45]

59.    At the time of this filing, Mylan also announced that it was also under investigation by the Securities and Exchange Commission.[46]

**2.    Senators Ask the Federal Trade Commission To Investigate Mylan**

60.    Also in September 2016, two United States Senators—Senator Richard Blumenthal and Senator Amy Klobuchar—asked the Federal Trade Commission to investigate whether Mylan violated federal antitrust laws to protect EpiPen®s from competition.[47]

61.    According to Senator Richard Blumenthal's office: "Schools [who used the EpiPen4Schools®  Program] were required to sign a contract agreeing not to purchase any products from Mylan's competitors for a period of 12 months — conduct that can violate the antitrust laws when taken by a monopolist."[48]

---

[43] Jeff Overley, *Mylan Inks $465M Deal Over EpiPen Rebates*, Law360, http://www.law360.com/articles/849765/mylan-inks-465m-deal-over-epipen-rebates (Oct. 7, 2016).
[44] *Id.*
[45] Zachary Tracer, *Mylan Agrees to $465 Million EpiPen Settlement With U.S.*, Bloomberg (Oct. 7, 2016), http://www.bloomberg.com/news/articles/2016-10-07/mylan-agrees-to-465-million-settlement-with-u-s-over-epipen.
[46] *Id.*
[47] Dan Mangan, *New York Attorney General Launches Antitrust probe of Mylan's EpiPen Contracts*, CNBC (Sept. 6, 2016), http://www.cnbc.com/2016/09/06/new-york-attorney-general-launches-antitrust-probe-of-mylans-epipen-contracts.html.
[48] Richard Blumenthal, Blumenthal & Klobuchar, *Call for Immediate Federal Investigations into Possible Antitrust Violations by EpiPen Manufacturer* (Sept. 6, 2016), https://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-and-klobuchar-call-for-immediate-federal-investigation-into-possible-antitrust-violations-by-epipen-manufactrurer.

CLASS ACTION COMPLAINT

### 3.     The New York State Attorney General Begins Antitrust Investigations

62.     The New York State Attorney General began a similar investigation into Mylan's effort to require that schools and other public places carry their product, alleging that it was in violation of state and federal anti-trust laws.[49]

63.     Specifically, New York Attorney General Eric Schneiderman alleged that schools using Mylan's "EpiPen4Schools® Program"—a program that provides free EpiPen® products to schools— were contractually barred from buying products from Mylan's competitors for one year.[50]

64.     In announcing his investigation, Attorney General Eric Schneiderman said: "If Mylan engaged in anti-competitive business practices, or violated antitrust laws with the intent and effect of limiting lower cost competition, we will hold them accountable."[51]

### 4.     The West Virginia State Attorney General Initiates Fraud Investigations

65.     In September 2016, the West Virginia State Attorney General opened an investigation into Mylan's Medicaid Drug rebate program.[52]

66.     Specifically, the West Virginia Attorney General "is investigating if Mylan was issuing Medicaid rebates for EpiPen®s at 'non-innovator' levels, which are typically used for generic drugs, rather than at 'innovator' levels, which are used for name-brand drugs.[53]

---

[49] Erik Larson & Jared S. Hopkins, *Mylan's EpiPen School Sales Trigger N.Y. Antitrust Probe*, Bloomberg (Sept. 6, 2016), http://www.bloomberg.com/news/articles/2016-10-07/mylan-agrees-to-465-million-settlement-with-u-s-over-epipen.

[50] Fortune, *Mylan's EpiPen Problems Just Got a Whole Lot Worse* (Sept. 6, 2016), http://fortune.com/2016/09/06/mylan-antitrust-probe-epipen-new-york-ag/.

[51] Attorney General Eric T. Schneiderman, *A.G. Schneiderman, Launches Antitrust Investigation Into Mylan Pharmaceuticals Inc., Maker Of Epipen* (Sept. 6, 2016), http://www.ag.ny.gov/press-release/ag-schneiderman-launches-antitrust-investigation-mylan-pharmaceuticals-inc-maker.

[52] Jeff Feeley, & Robert Langreth, *Mylan Investigations Mount as West Virginia Opens Fraud Probe*, Bloomberg News (Sept. 20 2016).

[53] Gillian Mohney, *West Virginia Attorney General Investigate EpiPen Maker Mylan*, ABC News (Sept. 20, 2016), http://abcnews.go.com/Health/west-virginia-attorney-general-investigates-epipen-maker-mylan/story?id=42231963.

67.     Mylan has refused to co-operate with the West Virginia Attorney General's investigation.[54]

**H.     In September 2016, Congress Convened a Hearing Regarding Mylan's Price Hikes in Response to Consumer Complaints**

68.     Consumers' outcry over the price of EpiPen®s has been emphatic and desperate, and the Federal Trade Commission has been flooded with complaints by consumers who can no longer afford their medication, a few of which are reproduced below:

A.     A New Jersey Consumer reported: "My son has required an EpiPen® since he was born. Over the past 21 years the cost has skyrocketed and I can no longer afford it.  My insurance company informs me that our out of pocket cost this year is $622.23."[55]

B.     A Washington Consumer reported:  "When refilling my annual prescription for an EpiPen® needed because of my allergy to bees, I learned I would have to pay $610+ out of pocket.  I have health insurance with a high deductible and this cost seems out of control.  Even the generic alternative at Costco is priced at $500+.  This feels like price gouging/fixing as most people won't be able to forgo filling this prescription.  Compounding the problem is that the medication is only available in a 2-pack.  I chose not to refill mine at that cost."[56]

C.     A Vermont Consumer reported: "I got a prescription from my doctor and just could not believe the pen with no insurance is now $500 and my co-pay $200 which I simply cannot afford yearly. I am on disability with a very limited income.  I just want to cry! Mylan and others simply MUST be price regulated.  I can't find any other assistance program for this.  I have written to Mylan about this, in this month of Nov., but there has been no response."[57]

---

[54] *Id.*

[55] Matt Novak, *EpiPen Price Gouging Complaints Have Flooded the FTC for Years*, Gizmodo (Sept. 7, 2016), http://gizmodo.com/epipen-price-gouging-complaints-have-flooded-the-ftc-fo-1786325838.

[56] *Id.*

[57] *Id.*

CLASS ACTION COMPLAINT

69.     In response to these and other complaints, on September 27, 2016, the House Oversight and Government Reform Committee held a hearing to address concerns over Mylan regarding the company's 500% price increase.

**I.     Mylan, Seeking to Justify its Price Increases, Made a Number of Material Misrepresentations to the Congressional Committee**

70.     Mylan's CEO Heather Bresch testified before the House Oversight and Government Reform Committee and gave a number of explanations for the company's practices, many of which the company was forced to rescind and/or clarify.

**1.     Mylan Misrepresented its Costs & Profits**

71.     Bresch first testified to Congress, under oath, that the high price of EpiPen®s is justified because the company makes only $100 in profit from a $608 two pack of EpiPen®s.  Specifically, she explained:

> I know there is considerable concern and skepticism about the pricing of EpiPen® Auto-Injectors. I think many people incorrectly assume we make $600 off each EpiPen®. This is simply not true. In the complicated world of pharmaceutical pricing there is something known as the Wholesale Acquisition Cost or WAC. The WAC for a 2 unit pack of EpiPen® Auto-Injectors is $608. After rebates and various fees, Mylan actually receives $274. Then you must subtract our cost of goods which is $69. This leaves a balance of $205. **After subtracting all EpiPen® Auto-Injector related costs our profit is $100, or approximately $50 per pen.** The misconception about our profits is understandable, and at least partly due to the complex environment in which pharmaceutical prices are determined. The pricing of a pharmaceutical product is opaque and frustrating, especially for patients.[58]

72.     The following day, however, Mylan confirmed admitted that these statements made by its CEO, under oath, were misleading.  In response to questions from *The Wall Street Journal*, Mylan reported that "the profit figure . . . included taxes, which the company didn't clearly convey to Congress.

---

[58] Testimony of Mylan CEO Heather Bresch before the United States House of Representatives Committee on Oversight and Government Reform (Sept. 21, 2016), http://www.mylan.com/-/media/mylancom/files/news/oral-testimony-of-mylan-ceo-heather-bresch-before-the-united-states-house-of-representatives-committee-on-oversight-and-government-reform.pdf.

CLASS ACTION COMPLAINT

The company substantially reduced its calculation of EpiPen® profits by applying the statutory U.S. corporate tax rate of 37.5%—five times Mylan's overall tax rate last year."[59]

73.     In reality, "Mylan's profits on the EpiPen 2-Pak® were about 60% higher than the figure given to Congress,"[60] according to a number of exposés,[61] reproduced below:

 

http://californiahealthline.org/morning-breakout/mylan-misrepresented-epipen-profits-to-congress-by-60-percent/

**2.     Mylan Misrepresented its "Re-Design" of the EpiPen®**

74.     Bresch also testified that it invested "more than one billion dollars" in the EpiPen® product "to enhance the product and make it more available."[62]  Specifically, Bresch claimed:

> In the more than 8 years we have owned the EpiPen® product, we have worked diligently and invested to enhance the product and make it more available. In fact, we have invested more than one billion dollars in the efforts. On many fronts we have succeeded. We put a much improved EpiPen® device on the market in 2009. We've also invested so that we can soon offer a longer shelf life, which means patients will go longer before needing a refill.[63]

---

[59] Mark Maremont, *Mylan's EpiPen Pretax Profits 60% Higher Than Number Told to Congress*, The Wall Street Journal (Sept. 26, 2016), http://www.wsj.com/articles/mylan-clarifies-epipen-profit-figures-it-provided-to-congress-last-week-1474902801.

[60] Meg LaTorre-Snyder, *Lawmakers Misled: Epipen Profits are 60% Higher Than What Mylan Disclosed to Congress*, Pharmaceutics Processing (2016).

[61] *Id.*; California Healthline, *Mylan Misrepresented EpiPen Profits to Congress by 60 Percent* (Sept. 27, 2016), http://californiahealthline.org/morning-breakout/mylan-misrepresented-epipen-profits-to-congress-by-60-percent/.

[62] Ben Popken, *Mylan's Upgraded EpiPen Torn Apart By Experts*, NBC News (Sept. 20, 2016), http://www.nbcnews.com/business/consumer/mylan-says-it-upgraded-epipen-2009-so-experts-looked-inside-n652651.

[63] Testimony of Mylan CEO Heather Bresch before the United States House of Representatives Committee on Oversight and Government Reform Wednesday, September 21, 2016, http://www.mylan.com/-/media/mylancom/files/news/oral-testimony-of-mylan-ceo-heather-bresch-before-the-united-states-house-of-representatives-committee-on-oversight-and-government-reform.pdf.

CLASS ACTION COMPLAINT

75.     But according to  Dr. Julie C. Brown, a University of Washington School of Medicine pediatric emergency physician, Mylan's "redesign" uses the same core device that's been in use for some time. [64] Indeed, as the below image indicates, the most notable difference between the original and redesigned EpiPen® is a plastic sheathing[65] —hardly a justification for a 500% price increase.



http://www.nbcnews.com/business/consumer/mylan-says-it-upgraded-epipen-2009-so-experts-looked-inside-n652651

76.     Further, according to Lauren Kashtan, the Head of North America Communications at Mylan, in a letter to NBC News reproduced below,[66]  the re-design includes many cosmetic changes, such as changing the color of the plastic used.

77.     When asked by investigative reporters about the company's 400-500% increase in prices, Kashtan provided the following list of 'improvements', none of which come close to justifying Mylan's extreme price increases:

---

[64] Ben Popken, *Mylan's Upgraded EpiPen Torn Apart By Experts*, NBC News (Sept. 20, 2016), http://www.nbcnews.com/business/consumer/mylan-says-it-upgraded-epipen-2009-so-experts-looked-inside-n652651.
[65] *Id.*
[66] *Id.*

CLASS ACTION COMPLAINT

**Next-Generation Auto-Injector Product Features**

- Built-in needle protection with a Never-See-Needle® -- there is no exposed needle before or after use

- An ergonomically-designed, easy-to-grasp oval barrel with illustrated instructions that allow for rapid understanding and proper use of EpiPen® Auto-Injector. The oval shape also prevents the device from rolling out of reach during an emergency

- One-step flip-top carry case that allows for rapid, single-handed removal

- Bright orange colors and arrows to help quickly identify the needle end of the device and reduce the risk of accidental thumb puncture and accidental injection of the product into the patient's or caregiver's finger

- Color changes made so the two strengths looked different from one another – yellow for 0.3mg and green for 0.15mg – to help patients, caregivers and healthcare providers quickly distinguish between the two strengths.

- Trainer changed to a grey body so there would be no confusion between Trainer and EpiPen® Auto-Injector to decrease the likelihood a patient or caregiver would accidentally use the trainer (which has no drug) instead of the actual device to treat an anaphylactic reaction.

Thanks,
Lauren

Lauren Kashtan
Head of North America Communications
Mylan
1000 Mylan Boulevard
Canonsburg, PA 15317

http://www.nbcnews.com/business/consumer/mylan-says-it-upgraded-epipen-2009-so-experts-looked-inside-n652651

**J.    Plaintiffs' Purchases**

78.    Plaintiff Kimberly Corcoran has had to purchase EpiPen® products for her minor son since 2011, following a diagnosis of a peanut allergy shortly before his second birthday; an allergy which he will likely not outgrow and will require a prescription emergency treatment option for the duration of his life.  Plaintiff Corcoran is required to purchase and maintain six pens at all times: two at school, two at home, and two at daycare.

79.    Plaintiff Todd Beaulieu has been purchasing EpiPen®s for more than ten years, and actually began purchasing EpiPen® products prior to Mylan's acquisition of the product line.  Mr. Beaulieu requires the use of an epinephrine auto-injector due to his severe allergy to insect venom.  As a

CLASS ACTION COMPLAINT

result he is required to store six to eight pens at all times – including two at his workplace, two at home, and two in his car.  Mr. Beaulieu also stores expired pens in order to meet this requirement. The cost to Mr. Beaulieu has varied significantly over the years, but has ranged from $15.00 for a single-pack to close to $300.00 out of pocket, after insurance.

## VI.    CLASS ALLEGATIONS

80.    Plaintiffs brings this suit on behalf of themselves and, pursuant to Federal Rule of Civil Procedure 23, on behalf of the following Class:

> All persons who, for purposes other than resale, purchased or paid for EpiPen® products from at least 2007 through the present.  For purposes of the Class definition, individuals "purchased" these drugs if they paid all or part of the purchase price.

81.    Excluded from the Class are the Defendants, the officers, directors or employees of the Defendants, the attorneys in this case and any judge assigned to this matter, including the Court's staff.

82.    **Numerosity**.  The proposed Class is sufficiently numerous and its members  are dispersed throughout the United States, making joinder of all members impracticable.  Indeed, millions of EpiPen®s are purchased annually throughout the United States.

83.    **Commonality**.  Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual class members, including: whether Defendants charged an excessive price for their product; whether Defendants made material misrepresentations regarding their product; whether Defendants abused their dominant market position; whether Defendants acted intentionally with respect to the foregoing; whether Defendants acted in violation of state and federal law; and whether Plaintiffs are entitled to damages and/or injunctive relief.

84.    **Typicality**.  Plaintiffs' claims are typical of the claims of members of the proposed Class because, among other things, Plaintiffs and Class members sustained similar injuries as a result of Defendants' uniform wrongful conduct and their legal claims all arise from the same conduct.

85.    **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the proposed Class.  Plaintiffs' interests do not conflict with Class members' interests and Plaintiffs' have retained

counsel experienced in complex class action and consumer protection litigation to prosecute this case on behalf of the Class.

86.     **Rule 23(b)(3)**.  In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3).  Common questions of law and fact predominate over any questions affecting only individual class members and a class action is superior to individual litigation.  The amount of damages available to individual plaintiffs is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedure.  Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

87.     **Rule 23(b)(2)**.  Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(b)(2).  Defendants have acted or refused to act on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

## VII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**On Behalf of Plaintiff Corcoran and the California Members of the Class Against All Defendants**
**(Cal. Civ. Code §§ 1750, *et seq.*)**

88.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

89.     Plaintiff Corcoran brings this Count on behalf of all members of the Class who are or have been residents of California at any relevant time ("California members of the Class").

CLASS ACTION COMPLAINT

90.     California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

91.     Defendants' EpiPen® products are "goods" as defined in Cal. Civ. Code § 1761(a).

92.     Plaintiff Corcoran and the other California members of the Class are "consumers" as defined in Cal. Civ. Code § 1761(d).

93.     Plaintiff Corcoran, the other California members of the Class, Mylan Pharmaceuticals, Inc. and Mylan Specialty L.P. are "persons" as defined in Cal. Civ. Code § 1761(c).

94.     Mylan Pharmaceuticals, Inc. and Mylan Specialty L.P.'s conduct, as described herein, was and is in violation of the CLRA.

95.     Mylan Pharmaceuticals, Inc. and Mylan Specialty L.P.'s conduct violates at least the following enumerated CLRA provisions:

A.     Cal. Civ. Code § 1770(a)(5): Representing that goods have characteristics, uses, and benefits which they do not have;

B.     Cal. Civ. Code § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another; and

C.     Cal. Civ. Code § 1770(a)(9): Advertising goods with intent not to sell them as advertised.

96.     As alleged throughout this Complaint, Mylan Pharmaceuticals, Inc. and Mylan Specialty L.P. engaged in unfair methods of competition and unfair or deceptive acts or practices in violation of California's Consumers Legal Remedies Act including, but not limited to: (A) misclassifying its EpiPen® products as generic drugs; (B) making material misrepresentations regarding its reasons for increasing the price of its EpiPen® products; (C) making material misrepresentations regarding the reason its EpiPen® products are sold only in two packs; and (D) exploiting its dominant market position to unreasonably increase the price of EpiPen® products.

97.     Plaintiff Corcoran and the California members of the Class have suffered injury in fact and actual damages resulting from Mylan Pharmaceuticals, Inc. and Mylan Specialty L.P.'s material omissions and misrepresentations because they paid an inflated price for EpiPen® products.

98.     The facts concealed and omitted by Mylan Pharmaceuticals, Inc. and Mylan Specialty L.P. were material in that a reasonable consumer would have considered them to be important.

99.     Plaintiff Corcoran and the California members of the Class' injuries were proximately caused by Mylan Pharmaceuticals, Inc. and Mylan Specialty L.P.'s material omissions and misrepresentations because they paid an inflated price for EpiPen® products.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW**
**On Behalf of Plaintiff Corcoran and the California Members of the Class Against All Defendants**
**(Cal. Bus. & Prof. Code §§ 17500, *et seq.*)**

100.     Plaintiff Corcoran incorporates by reference all preceding allegations as though fully set forth herein.

101.     Plaintiff Corcoran brings this Count on behalf of all members of the Class who are or have been residents of California at any relevant time ("California members of the Class").

102.     California Bus. & Prof. Code § 17500 provides:

It is unlawful for any corporation...with intent directly or indirectly to dispose of real or personal property...to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, ... or in any other manner or means whatever, including over the Internet, any statement ... which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

103.     As alleged throughout this Complaint, Mylan Pharmaceuticals, Inc. and Mylan Specialty L.P. caused to be made or disseminated throughout California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Mylan

Pharmaceuticals, Inc. and Mylan Specialty L.P. to be untrue and misleading to consumers, including Plaintiffs and the other Class members.

104.    Plaintiff Corcoran and the other Class members have suffered an injury in fact, as a result of Mylan Pharmaceuticals, Inc. and Mylan Specialty L.P.'s unfair, unlawful, and/or deceptive practices. Mylan made misrepresentations and/or omissions of Mylan Pharmaceuticals, Inc. and Mylan Specialty L.P. with respect to the design, cost, and efficacy of Defendants' EpiPen® products.

105.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Mylan Pharmaceuticals, Inc. and Mylan Specialty L.P.'s business.  Mylan Pharmaceuticals Inc. and Mylan Specialty L.P.'s wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

106.    Plaintiff Corcoran individually and on behalf of the other California members of the Class, request that this Court enter such orders or judgments as may be necessary to enjoin Mylan Pharmaceuticals, Inc.  and Mylan Specialty L.P. from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class members any money Mylan Pharmaceuticals, Inc. and Mylan Specialty L.P.'s acquired by their violations of California's False Advertising law, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**On Behalf of Plaintiff Corcoran and the California Members of the Class Against All Defendants**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

107.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

108.    Plaintiff Corcoran brings this Count on behalf of all members of the Class who are or have been residents of California at any relevant time ("California members of the Class").

109.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."  Mylan Pharmaceuticals, Inc. and Mylan Specialty L.P. has

engaged in unlawful, fraudulent, and unfair business acts and practices in violation of California's Unfair Competition law.

110.    As alleged throughout this Complaint, Mylan engaged in unfair, deceptive, and/or unlawful practices in violation of California's Unfair Competition law including, but not limited to: (A) misclassifying its EpiPen® products as generic drugs; (B) making material misrepresentations regarding its reasons for increasing the price of its EpiPen® products; (C) making material misrepresentations regarding the reason its EpiPen® products are sold only in two packs; and (D) exploiting its dominant market position to unreasonably increase the price of EpiPen® products.

111.    Defendants' unfair, unlawful and/or deceptive activity alleged herein caused Plaintiffs and the California members of the Class to purchase EpiPen® products at inflated prices.

112.    Accordingly, Plaintiff Corcoran and the California members of the Class have suffered injury in fact including lost money or property as a result of Defendants' misrepresentations and omissions.

113.    Plaintiff Corcoran seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendant under Cal. Bus. & Prof. Code § 17200.

114.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Mylan Pharmaceuticals, Inc. and Mylan Specialty L.P. from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Class any money Defendants' acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

**FOURTH CLAIM FOR RELIEF**
**VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT**
**On Behalf of Plaintiff Beaulieu and the Massachusetts Members of the Class Against All**
**Defendants**
**(Mass. Gen. Laws Ch. 93A §§ 1, *et seq.*)**

115.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

116.    Plaintiff Beaulieu bring this Count on behalf of all members of the Class who are or have been residents of Massachusetts at any relevant time ("Massachusetts members of the Class").

117.    Massachusetts's Consumer Protection Act, Mass. Gen. Laws ch. 93A makes it unlawful to engage in any unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.  Unfair acts or practices include practices that are within at least the penumbra of some common-law, statutory, or other established concept of unfairness; immoral, unethical, oppressive, or unscrupulous acts; or acts that cause substantial injury.  Deceptive acts or practices include those that would reasonably cause a person to act differently from the way he or she otherwise would have acted.

118.    As alleged throughout this Complaint, Mylan engaged in unfair, deceptive, and/or unlawful practices in violation of Mass. Gen. Laws ch. 93A including, but not limited to: (A) misclassifying its EpiPen® products as generic drugs; (B) making material misrepresentations regarding its reasons for increasing the price of its EpiPen® products; (C) making material misrepresentations regarding the reason its EpiPen® products are sold only in two packs; and (D) exploiting its dominant market position to unreasonably increase the price of EpiPen® products.

119.    As alleged throughout this Complaint, Mylan also engaged in unfair and unscrupulous practices by raising the price of life-saving medication without justification and limiting patient access to alternatives resulting in substantial harm.

120.    Mylan's conduct offends public policy and is immoral, unethical, oppressive, unscrupulous, or substantial injurious to consumers.  Additionally, Mylan's conduct was deceptive

because it caused Plaintiffs and the Massachusetts members of the Class to act differently from the way they would have otherwise acted.

121.    Mylan's unfair and/or deceptive acts or practices in violation of Mass. Gen. Laws Ch. 93A, § 2, proximately caused Plaintiffs and the Massachusetts members of the Class adverse consequences or losses, including the loss of money from purchasing Mylan's EpiPen® products at an inflated price.  The losses and adverse consequences that Plaintiffs and the Massachusetts members of the Class suffered by purchasing Mylan's EpiPen® products were foreseeable results of Mylan's unfair, deceptive, and/or unlawful advertising and marketing.

122.    As a result of Mylan's violations of Massachusetts's Consumer Protection Act, Plaintiffs and the Massachusetts members of the Class seek an order of this Court awarding actual damages, punitive damages, restitution, an injunction against the use of unlawful trade practices, attorneys' fees and costs, and for such other relief as set forth below.

**FIFTH CLAIM FOR RELIEF**
**FRAUD BY CONCEALMENT**

123.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

124.    Mylan intentionally concealed and suppressed material facts concerning the quality and efficacy of its EpiPen® products.  Mylan, at least: (A) misclassified its EpiPen® products as generic drugs; (B) made material misrepresentations regarding its reasons for increasing the price of its EpiPen® products; (C) made material misrepresentations regarding the reason its EpiPen® products are sold only in two packs; and (D) exploited its dominant market position to unreasonably increase the price of EpiPen® products.

125.    Plaintiffs and the Class reasonably relied upon Mylan's false representations and/or were forced to purchase Mylan's products despite those representations due to Mylan's unfair commercial practices.  They had no way of knowing that Mylan representations were false and gravely misleading.

CLASS ACTION COMPLAINT

126.    Mylan had a duty to consumers to disclose the true quality and efficacy of their EpiPen® products and had a duty to their regulators to disclose its true profit margin.  But Mylan actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and it did so at the expense of Plaintiffs and the Class.

127.    Plaintiffs and members of the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did with respect to Defendants' excessive prices if they had known of the concealed and/or suppressed facts.

128.    Because of the concealment and/or suppression of the facts, Plaintiffs and members of the Class have sustained damage because they paid inflated prices for Defendants' EpiPen® products.

129.    Accordingly, Defendants are liable to Plaintiffs and members of the Class for damages in an amount to be proven at trial.

130.    Mylan's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and members of the Class' rights and warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## SIXTH CLAIM FOR RELIEF
## NEGLIGENT MISREPRESENTATION

131.    Plaintiffs incorporate the allegations in the above paragraphs as if fully set forth herein.

132.    As alleged herein, Defendants made a number of misrepresentations concerning the quality and efficacy of its EpiPen® products including: (A) misclassifying its EpiPen® products as generic drugs; (B) making material misrepresentations regarding its reasons for increasing the price of its EpiPen® products; (C) making material misrepresentations regarding the reason its EpiPen® products are sold only in two packs; and (D) exploiting its dominant market position to unreasonably increase the price of EpiPen® products.

133.    At the time Defendants made these representations, Defendants knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

134.    The negligent misrepresentations and omissions made by Defendants, upon which Plaintiff and all Class members reasonably and justifiably relied, were intended to induce, and actually induced, Plaintiffs and Class members to purchase Defendants' EpiPen® products at an inflated price.

**SEVENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**

135.    Plaintiffs incorporate the allegations in the above paragraphs as if fully set forth herein.

136.    To the detriment of Plaintiffs and Class members, Mylan has been, and continues to be, unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein.

137.    Mylan has voluntarily accepted and retained the inflated prices paid by Plaintiffs and Class members with full knowledge that they were not lawfully entitled to it.

138.    Between Defendants and Plaintiffs/Class members, it would be unjust for Mylan to retain the benefits attained by its wrongful actions.

139.    Mylan has been unjustly enriched, in the form of inflated prices, at the expense of Plaintiffs and Class members who are entitled in equity to disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits, to the extent, and in the amount deemed appropriate by the court, and any other relief the court deems just and proper to remedy Defendants' unjust enrichment.

**EIGHTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**

140.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

141.    As previously alleged, Plaintiffs and the Class have stated claims against Mylan based on fraud, negligence, unjust enrichment and violations of California and Massachusetts state law.

142.    Mylan has failed to live up to its obligations to provide accurate information to consumers regarding its EpiPen® products and offer those products at a fair and reasonable price.

143.    An actual controversy has arisen regarding Mylan's current obligations to provide accurate information to consumers regarding their EpiPen® products and offer those products at a fair and reasonable price.  On information and belief, Mylan denies that it previously had nor now has any such obligation.

144.     Plaintiffs thus seek a declaration that, in order to comply with its existing obligations, Mylan must truthfully sell and market its EpiPen® products.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class respectfully request that the Court enter judgment in their favor and against Mylan, as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B.    An order temporarily and permanently enjoining Mylan from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Injunctive relief, including public injunctive relief, as the court deems appropriate;

D.    Costs, restitution, damages, and disgorgement in an amount to be determined at trial;

E.    Revocation of acceptance;

F.    Declaratory relief as the court deems appropriate;

G.    Treble and/or punitive damages as permitted by applicable laws;

H.    An order requiring Mylan to pay both pre- and post-judgment interest on any amounts awarded;

I.    An award of costs and attorneys' fees; and

J.    Such other or further relief as may be appropriate.

## IX.    JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

CLASS ACTION COMPLAINT

DATED this 17th day of October, 2016.

KELLER ROHRBACK L.L.P.


By */s/ Jeffrey Lewis*
    Jeffrey Lewis (66587)
    Jacob Richards (273476)
    KELLER ROHRBACK L.L.P.
    300 Lakeside Drive, Suite 1000
    Oakland, CA 94612
    (510) 463-3900, Fax (510) 463-3901
    jrichards@kellerrohrback.com
    jlewis@kellerrohrback.com

    Matthew J. Preusch (298144)
    mpreusch@kellerrohrback.com
    KELLER ROHRBACK L.L.P.
    1129 State Street, Suite 8
    Santa Barbara, CA 93101
    (805) 456-1496, Fax (805) 456-1497

    Derek W. Loeser, *pro hac vice forthcoming*
    dloeser@kellerrohrback.com
    Gretchen Freeman Cappio, *pro hac vice forthcoming*
    gcappio@kellerrohrback.com
    Michael Meredith, *pro hac vice forthcoming*
    mmeredith@kellerrohrback.com
    KELLER ROHRBACK L.L.P.
    1201 Third Avenue, Suite 3200
    Seattle, WA 98101
    (206) 623-1900, Fax (206) 623-3384

    ***Attorneys for Plaintiffs***

CLASS ACTION COMPLAINT